UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Christina Henry, | ) |
| Plaintiff, | ) Case No.: 1:22-cv-00679 |
| vs. | ) Judge Michael R. Barrett |
| Southern Ohio Medical Center, | ) |
| Defendant. | ) |

**OPINION & ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 21). Plaintiff has filed a memorandum in opposition (Doc. 25), to which Defendant has replied (Doc. 26).[1] For the reasons that follow, Defendant's Motion will be GRANTED.

I. BACKGROUND

**Plaintiff's employment history with Defendant.** Beginning March 3, 2020, Plaintiff Christina Henry worked as a Licensed Practical Nurse ("LPN") for Defendant Southern Ohio Medical Center ("SOMC") in its Pediatric Medical Office. (Henry Aff., Doc. 25-1 (¶ 2)). In this position, Henry had direct contact with patients. (Blankenship[2] Decl., Doc. 21-3 (¶ 29)).

---

[1] The parties also filed several notices of supplemental authority. (Docs. 27–31).

[2] Sara Blankenship is SOMC's Manager of Employee Health and Wellness. (Doc. 21-3 (¶ 2)).

1

In response to the COVID-19 pandemic, SOMC adopted a vaccination policy for all staff, but allowed employees with religious objections to submit to weekly nasopharyngeal testing in lieu of vaccination. (*Id.*, Doc. 21-3 (¶¶ 20–25)). In August 2021, all employees, Henry included, were notified of the requirement to be vaccinated no later than September 17, 2021. (*See* Blankenship Decl., Doc. 21-3 (¶ 22); Henry Aff., Doc. 25-1 (¶ 3)). On September 3, 2021, Henry informed SOMC that her "sincerely held religious beliefs" prevented her from not only receiving a COVID-19 vaccination, but also from nasopharyngeal testing. (Doc. 21-3 PAGEID 263–68; Henry Aff., Doc. 25-1 (¶ 4)). She also stated a religious objection to wearing a mask, although she later relented on this point. (Doc. 21-3 PAGEID 263–64; Henry Aff., Doc. 25-1 (¶ 5)). On September 14, 2021, Henry hand-delivered a letter that stated in part: "This requirement to be fully vaccinated for Covid-19 and submit to Covid testing is something I cannot participate in because doing so would **harm my soul**. I make this request for the glory of God and consistent with my faith." (Doc. 21-3 PAGEID 273 (bold emphasis in original)). She proposed "self-screening" as an alternative to testing. (Henry Depo., Doc. 21-4 PAGEID 322 (49:10–22)). That is to say, "I would stay home if I'm sick." (*Id.*, Doc. 21-4 PAGEID 322 (49:15)).

**Plaintiff's termination and this lawsuit.**  Henry was placed on unpaid personal leave of absence status effective September 17, 2021. (Doc. 21-2 PAGEID 245–46 (57:25–58:15)). She eventually filed a four-count Complaint against SOMC, alleging religious discrimination (based on a failure to accommodate) and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Counts I & II) and perceived disability discrimination and retaliation (and coercion) in violation of the Americans with Disabilities

2

Act of 1990, as amended (Counts III & IV). (*See* Doc. 1). Counts III and IV were later dismissed (without prejudice) at the request of the parties pursuant to Fed. R. Civ. P. 21. (*See* Docs. 23, 24). Accordingly, the Court will consider Henry's Title VII claims only.

## II.     LAW & ANALYSIS

**Standard.**  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.* On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49. Additionally, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**Title VII.**  The Court borrows from the Sixth Circuit's very recent synopsis:

> Title VII prohibits an employer from "discharg[ing] any individual ... because of such individual's ... religion." 42 U.S.C.     § 2000e-2(a)(1). "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* §2000e(j).  "The heart of the failure-to-

>accommodate claim is that an employer discharges (or otherwise discriminates against) an employee for failing a job-related requirement instead of abiding by its 'statutory obligation to make reasonable accommodation for the religious observances' of its employees." *Savel v. MetroHealth Sys.*, 96 F.4th 932, 943–44 (6th Cir. 2024) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75, 97[,    ] (1977)).

*Aimee Sturgill v. Am. Red Cross*, No. 24-1011, --- F.4th ---, 2024 WL 3886589, at *3 (6th Cir. Aug. 21, 2024). "To establish a prima facie case of religious discrimination by failure to accommodate, a plaintiff must plead facts that, if believed, show (1) she holds a sincere religious belief that conflicts with an employment requirement, (2) she has informed the employer about the conflict, and (3) she was terminated because of the conflicting requirement." *Prida v. Option Care Enters., Inc.*, No. 5:23-cv-00905, 2023 WL 7003402, at *3 (N.D. Ohio Oct. 24, 2023) (citing *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007)), *appeal docketed*, No. 23-3936 (6th Cir. Nov. 20, 2023).[3] "The plaintiff raising a religious discrimination claim must further plead facts that, if believed, demonstrate it was the 'religious aspect of her [conduct] that motivated her employer's actions.'" *Id.* (citing *Pedreira v. Ky. Baptist Homes for Child., Inc.*, 579 F.3d 722, 728 (6th Cir. 2009) (quoting *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 627 (6th Cir. 2000))). "This is so regardless of whether the plaintiff frames her claim as a discriminatory discharge or a failure to accommodate." *Id.* "Once a prima facie case is established, the burden shifts to the employer to demonstrate that accommodating the employee's belief imposes 'undue hardship' on the employer." *Id.* (citing *Groff v. DeJoy*, 600 U.S. 447, 454 (2023)).

A prima facie showing of Title VII retaliation requires a plaintiff to establish these four elements: (1) she engaged in protected activity, (2) her employer knew she did so, (3) she subsequently suffered an adverse employment action, and (4) a causal

---

[3] Briefing is complete, but no date for argument has been set by the Sixth Circuit Clerk.

connection between the protected activity and the adverse employment action. *Laughlin v. City of Cleveland*, 633 F. App'x 312, 315 (6th Cir. 2015) (citing *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)). If she does so, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason for its actions." *Id.* (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008)). If the employer does so, the plaintiff must then demonstrate that the legitimate reason offered "was a pretext designed to mask retaliation." *Id.* (quoting *Imwalle*). To establish causation, a Title VII plaintiff must show that her "protected activity was a **but-for** cause of the alleged adverse action of the employer. *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (emphasis added)).

**Failure to accommodate.** As an initial matter, SOMC challenges the sincerity of Henry's religious beliefs. (*See* Doc. 21-1 PAGEID 168 & n.3, 172–73; Doc. 26 PAGEID 681–85). For purposes of summary judgment, however, the Court will presume (without deciding) that they are sincere.[4] With a prima facie case of religious discrimination established, at issue next is whether SOMC has demonstrated that Henry's proposed accommodation imposes an "undue hardship" on the conduct of its business. This inquiry is "context-specific". *Groff*, 600 U.S. at 473. At least one other district court has held—consistent with pre- and post-*Groff* authority—that "it is appropriate to consider not only calculable economic costs but also non-economic costs, like the cost to an employer's mission, in analyzing undue hardship." *MacDonald v. Oregon Health & Science Univ.*,

---

[4] *See Wise v. Children's Hosp. Med. Ctr. of Akron*, No. 5:22-CV-02092, 2024 WL 3345494, at *2 (N.D. Ohio July 9, 2024) ("While the Hospital raises a viable argument about the sincerity of Plaintiff's religious beliefs, the Court finds it unnecessary to resolve that issue. Assuming arguendo that Plaintiff has met her burden to establish a prima facie case, the Court finds the Hospital has met its burden to demonstrate that granting Plaintiff's testing exception would have caused an undue hardship."), *appeal docketed*, No. 24-3674 (6th Cir. Aug. 6, 2024).

No. 3:22-cv-01942-IM, 2024 WL 3316199, at *7 (D. Or. July 5, 2024), *appeal docketed*, No. 24-4852 (9th Cir. Aug. 8, 2024). And, "[a]long with considering both economic and non-economic costs when assessing undue hardship," it is also appropriate "to confine the analysis to the information available to the employer when it made its undue hardship analysis." *Id.* In other words, "[i]n determining whether an accommodation would pose an undue hardship, an employer is permitted to draw conclusions based on evidence and information that was available at the time." *Id.*

The following facts inform the Court's analysis.

SOMC is a 211-bed hospital (in Portsmouth, Ohio) that provides emergency and surgical care along with other healthcare services. (Applegate[5] Decl., Doc. 21-7 (¶ 3)). It employs over 3,000 full- and part-time employees, boasts a medical staff of more than 250 physicians and specialists, and is supported by hundreds of volunteers. (*See id.*, Doc. 21-7 (¶ 4)).[6]

With the onset of the COVID-19 pandemic in March 2020, SOMC took immediate steps to meet its obligation to provide a safe environment for its patients and employees while still fulfilling its critical functions as a hospital. (*See id.*, Doc. 21-7 (¶¶ 6, 7)). Not surprisingly, SOMC experienced "very high" levels of absenteeism (owing to employees ill from the virus) and, at the same time, "very high" demand for patient care (owing to members of the community ill from the virus). (*Id.*, Doc. 21-7 (¶¶ 11, 12)). Together,

---

[5] Ken Applegate is SOMC's Administrative Director of Human Resources. (Doc. 21-7 (¶ 2)). Sara Blankenship, in her role as SOMC's Manager of Employee Health and Wellness, reports directly to him. (*Id.* (¶ 9)).

[6] SOMC is a Section 501(c)(3) exempt organization that follows The Joint Commission's standards for healthcare. (Applegate Decl., Doc. 21-7 (¶¶ 3, 5)).

David Byers, M.D., Senior Medical Director for Infectious Diseases;[7] Timothy Cassity, Ph.D., a clinical microbiologist;[8] and Sara Blankenship, Manager of Employee Health and Wellness, developed and implemented SOMC's (evolving) COVID-19 protocols. (*Id.*, Doc. 21-7 (¶ 8)). They relied in large part on guidance from the Centers for Disease Control and Prevention ("CDC"). (*See* Byers Decl., Doc. 21-8 (¶¶ 11, 17); Cassity Decl., Doc. 21-10 (¶¶ 8, 9); Blankenship Decl., Doc. 21-3 (¶¶ 6, 10)).

COVID-19 "was recognized as being highly contagious." (Blankenship Decl., Doc. 21-3 (¶ 8)). To avoid its spread, before an employee could return to work after being ill from (or after exposure to) the virus, she had to test negative for COVID-19 infection. (*See id.*, Doc. 21-3 (¶¶ 9, 10)). From the outset, SOMC used nasopharyngeal specimens to test for infection. (*Id.*, Doc. 21-3 (¶ 12); Profitt[9] Decl., Doc. 21-9 (¶ 5)). At first, out of necessity, SOMC sent the specimens to a third party for analysis, (*see, e.g.*, Blankenship Decl., Doc. 21-3 (¶ 11); Cassity Decl., Doc. 21-10 (¶ 6)), with results returned anywhere between three to seven days (Blankenship Decl., Doc. 21-3 (¶ 13); Profitt Decl., Doc. 21-9 (¶ 5)). This waiting period exacerbated staff shortages, which, in turn, interfered with patient care. (*Id.*, Doc. 21-3 (¶¶ 11, 13)). By March 2021, however, SOMC was able to analyze the specimens in-house and, by August 2021, could do so in less

---

[7] Henry has filed a motion to exclude Dr. Byers as "an improper non-retained expert[.]" (Doc. 15). For purposes of summary judgment, the Court considers his testimony as it applies to the facts of (rather than the science behind) SOMC's COVID-19 protocols.

[8] Dr. Cassity was employed at SOMC from October 1978 until his retirement in February 2019. (Cassity Decl., Doc. 21-10 (¶ 2)). Beginning September 2019, Cassity worked as a consultant for SOMC. (*Id.*).

[9] Brad Profitt is the Administrative Director of the laboratory at SOMC. (Doc. 21-9 (¶ 5)).

than 24 hours. (Blankenship Decl., Doc. 21-3 (¶¶ 16–18); Profitt Decl., Doc. 21-9 (¶ 7)).[10] This quicker turnaround "significantly" reduced the time that an asymptomatic employee had to wait to return to work. (*Id.*, Doc. 21-3 (¶19)).

A vaccine against infection became publicly available in December 2020. (*Id.*, Doc. 21-3 (¶ 20)). SOMC eventually mandated that all employees be vaccinated by September 17, 2021. (*Id.*, Doc. 21-3 (¶ 22)). SOMC's department of Employee Health and Wellness received approximately 300 requests for religious exemption from the vaccine; these employees were offered the option of in-house weekly (nasopharyngeal) testing instead as an accommodation.[11] (*Id.*, Doc. 21-3 (¶¶ 23–26)).

As noted, Henry offered to "self-screen" as an alternative to testing. SOMC rejected this proposal. (*See* Applegate Depo., Doc. 21-5 PAGEID 414 (37:1–9) ("It just wasn't appropriate. We had people sick all the time that didn't know they were sick. She couldn't make an accurate decision."); Blankenship Decl., Doc. 21-3 (¶ 39) ("Based upon the fact that many individuals contracted Covid but could be contagious and spread the virus while still being asymptomatic, I did not consider Ms. Henry's proposal of self-screening a valid or legitimate way in which SOMC would be able to maintain a safe and healthy work environment for her patients and coworkers."); *see id.*, Doc. 21-3 (¶¶ 41, 42)).

---

[10] (*See* Cassity Decl., Doc. 21-10 (¶ 11) ("I ultimately recommended PCR testing for SARS-Cov-2 using nasopharyngeal swabs to SOMC because SOMC already had equipment which allowed it to perform such testing once I was able to validate the test procedure.")).

[11] Dr. Byers testified that bi-weekly (that is, twice-per-week) testing was "generally" recommended for unvaccinated individuals. (Byers Decl., Doc. 21-8 (¶16)). But because SOMC lacked the resources to conduct this "volume" of testing, Byers concluded that weekly testing would suffice. (*Id.*).

On September 14, 2021, Ken Applegate, SOMC's Administrative Director of Human Resources, contacted Henry by telephone, at the suggestion of Vicki Noel, Vice President of Human Resources (and Organizational Development)[12]. (Applegate Depo., Doc. 21-5 PAGEID 396–99 (19:1–22:2)).  Sara Blankenship joined as Applegate's witness.  (*Id.*, Doc. 21-5 PAGEID 397 (20:6–9); Henry Depo., Doc. 21-4 PAGEID 325 (52:13–19)).  The call was brief, lasting five to ten minutes.  (Applegate Depo., Doc. 21-5 PAGEID 420 (43:9–23); Blankenship Depo., Doc. 21-11 PAGEID 512 (36:11–19); Henry Depo., Doc. 21-4 PAGEID 324 (51:13–24)).  Its purpose was "to see if she was willing to return to work with the condition that we would test her – you know, twice weekly I think it was when we first started – but she said she did not want to be tested."  (Applegate Depo., Doc. 21-5 PAGEID 398 (21:1–8)).  In lieu of testing, Applegate offered Henry a leave of absence[13].  (*Id.*, Doc. 21-5 PAGEID 403 (26:7–16) ("You know, I know we were all hopeful she might come back to work and be tested.  If she didn't want to do that, then we developed, you know, another alternative, another reasonable accommodation for her.  We'd already reasonably accommodated her once since by allowing her to have the exemption from the vaccine.  Viable testing – it was a reasonable accommodation in itself; so our other option that we decided on would be a leave of absence.")).[14]  He asked Henry for her (final) decision (as to whether she would agree to be tested) by September

---

[12] (*See* Noel Depo., Doc. 21-2 PAGEID 195 (7:13–21)).

[13] (*See* Blankenship Depo., Doc. 21-11 PAGEID 521 (45:3–6) ("Q. And when an employee is put on a leave of absence, do they continue to receive a paycheck?  A. No.  It's an unpaid leave of absence.")).

[14] (*See also* Applegate Depo., Doc. 21-5 PAGEID 396 (19:16–24) ("Q. Prior to Ms. Henry being placed on leave, do you recall having a phone conversation with Ms. Henry?  A. Prior, we had a phone conversation to tell her that we were going to place her on leave.  We actually were talking about her accommodation and to ask her, you know, if she would consent to testing.  That was prior to the leave, a few days prior to the leave.")).

16, 2021. (Blankenship Decl., Doc. 21-3 (¶ 47)). Later that day, Henry hand-delivered (to Sara Blankenship) her previously referenced letter[15]. (*Id.*, Doc. 21-3 (¶ 48)).

Applegate denies that Henry asked (during their call) whether she could take a "saliva" test instead of a nasopharyngeal test. (*Id.*, Doc. 21-5 PAGEID 398–99 (21:9–22:2)).[16] Blankenship testified similarly. (Blankenship Depo., Doc. 21-11 PAGEID 512 (36:11–17)). And there is no reference to *any* alternative type of testing in Henry's hand-delivered letter, presumably drafted after the call. (*See* Doc. 21-3 PAGEID 273 ("This requirement to . . . submit to Covid testing is something I cannot participate in because doing so would **harm my soul**.") (bold emphasis in original)).

Henry's August 11, 2023 deposition testimony on this subject was equivocal:

Q. Okay. Did you say anything during that conversation?

A. **I just stated I was not going to agree to weekly testing, that form of weekly testing, and asked if there was any other forms of testing that was acceptable.** And he said no, there's not. I had to do that specific one.

Q. Did you have any other types of testing that you suggested or recommended, or did you just ask if they had other ones?

A. **I asked if there was something – any other types that was less invasive.** I was willing to spit in a – like, there's a type that you can spit in a cup.

Q. **Did you talk about that with Mr. Applegate, or is that just something you knew of?**

---

[15] (*See* Doc. 21-3 PAGEID 273).

[16] (*See also* Applegate Depo., Doc. 21-5 PAGEID 396–97 (19:25–20:2) ("Q. Okay. And did you discuss alternative forms of testing with Ms. Henry during this call? A. No."), PAGEID 401–02 (24:18–25:3) ("Q. Did you explore whether SOMC could have arranged for Ms. Henry to take a saliva test off-site? A. I had no reason to; she never suggested she wanted a saliva test. Q. Okay. So is it your contention that it is Ms. Henry's responsibility to suggest a reasonable accommodation? A. Not exactly. What I'm saying is that she didn't want to be tested at all is what she told us.")).

> A. **That was something I knew of. <u>I don't remember if I did ask them or not.</u>**
>
> Q. Okay. <u>Whether or not there were other forms of testing?</u>
>
> A. <u>**Correct.**</u>

(Henry Depo., Doc. 21-4 PAGEID 325–26 (52:22–53:15) (bold & underline emphases added)). But Henry's more recent testimony—in an affidavit executed on March 11, 2024 and submitted in opposition to SOMC's summary judgment motion—is far more exact:

> ....
>
> During a call with Kendall Applegate and Sara[ ] Blankenship on September 14, 2021, which lasted approximately 10 minutes at most, **I asked if I could take a different type of test, to which Mr. Applegate told me I could not.** I felt the entire purpose of this call was to threaten and coerce me to submit to weekly nasopharyngeal testing as neither Applegate nor Blankenship appeared willing to discuss the details of my accommodation request. Instead, Mr. Applegate attempted to scare me into compliance by telling me things such as COBRA insurance is not cheap, alluding to the fact that I would be fired if I did not meet SOMC's demands.
>
> **I <u>would have agreed</u> to do a different test such as the oropharyngeal, or "throat swab" test.** While this type of test would have been uncomfortable for me to engage in, it would have zeroed the chance of breaking the blood-brain barrier, and because of that zeroing I would have accepted weekly oropharyngeal testing as a reasonable accommodation to nasopharyngeal testing. **I <u>would have also accepted</u> the "anterior nares" test** as during this test the swab is not pushed as far into the nasal passages. This would have also been uncomfortable, but I would have accepted this test for the same reasons I would have accepted the throat swab. These, however, were never offered to me nor even suggested by any SOMC employee that I talked to concerning my request for accommodation. **Preferably I <u>would have taken</u> a saliva test** as those are the least invasive, but other tests would have been acceptable as well.
>
> I thought my willingness to work with SOMC on the masking issue would cause them to work with me on the testing issue, but I was met with inflexibility when it came to SOMC's demand that I take weekly nasopharyngeal tests. Mr. Applegate's statement that I could

11

> not take a different type of test caused me not to inquire further, and I was taken off payroll only 3 days after that conversation.
>
> ....

(Henry Aff., Doc. 25-1 (¶¶ 8, 9, 10) (bold & underline emphases added)). So, in her deposition, Henry couldn't remember if she asked about "other forms" of testing, yet eight months later, she was sure that she did.

"A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts here earlier deposition testimony." *Reich v. City of Elizabethtown*, 945 F.3d 968, 976 (6th Cir. 2019) (quoting *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)). This practice "is grounded on the sound proposition that a party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006). If this were not the case, it "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Reich*, 945 F.3d at 976 (quoting *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984)).

Henry's affidavit plainly contradicts her deposition testimony. *See Reich*, 945 F.3d at 976–77. Accordingly, this Court has the discretion to disregard it. *See id.* at 975. Yet, even "generously" viewing her affidavit as noncontradictory, Henry "makes no real attempt to argue that she filed her affidavit to supplement or clarify her deposition testimony—in other words, that it should not be viewed as 'an attempt to create a sham fact issue.'" *Id.* at 977 (quoting *Aerel*, 448 F.3d at 908)). In the end, however, it doesn't matter, because SOMC has met its burden to show undue hardship.

First, Henry's request for an accommodation to be exempt from *both* vaccination *and* testing, no matter the type, poses an obvious threat to her coworkers and to SOMC's vulnerable-by-definition patient population. This, by and of itself, constitutes undue hardship. *See Wise*, 2024 WL 3345494, at *2 ("The Court agrees with the Hospital that allowing the plaintiff to routinely come in for work at the Hospital while remaining unvaccinated and untested creates a heightened health risk that constitutes as an undue hardship.") (collecting cases); *see also Bushra v. Main Line Health, Inc.*, No. 23-1090, --- F. Supp. 3d ---, 2023 WL 9005584, at *8 (E.D. Pa. Dec. 28, 2023) ("The court takes judicial notice that COVID-19 caused a deadly global pandemic at a scale unseen in a century. . . It cannot be disputed that without the vaccine, Dr. Bushra was at great risk of contracting and transmitting the disease because he had frequent and direct contact with patients and staff as a doctor in the emergency room. Unvaccinated, Dr. Bushra risked infecting and even causing the death not only of his colleagues and MLH staff but also of vulnerable patients. The ability of MLH to continue its mission of caring for, treating, and healing the sick and injured would have been severely impaired with an unvaccinated Dr. Bushra in its midst. In sum, there can be no doubt that MLH would have incurred undue hardship in the form of substantial social, if not economic, costs if it had been required to accommodate Dr. Bushra's religious beliefs."), *appeal docketed*, No. 24-1117 (3d Cir. Jan. 19, 2024); *MacDonald*, 2024 WL 3316199, at *12 ("Based on the information and evidence available to it at the time, Defendant [Oregon Health and Science University] concluded that allowing an unvaccinated nurse to continue serving patients in the [Mother Baby Unit at its children's hospital] posed a substantial increased cost. Guidelines from the CDC, FDA, and WHO, which Defendant reasonably concluded bore indicia of validity

13

and reliability, combined with its own internal data analysis, led Defendant to conclude that an unvaccinated nurse in the [Mother Baby Unit] would put other staff members and a vulnerable patient population at risk. And allowing staff and patients to be put at risk compromised Defendant's mission to serve the community and keep it safe. Thus, allowing Plaintiff to continue as a nurse in the [Mother Baby Unit] without vaccination would unduly burden Defendant's mission and, by extension, the conduct of its particular business.").

Second, presuming (without deciding) that Henry did request a saliva test in lieu of a nasopharyngeal test, SOMC still meets its undue-hardship burden. Dr. Cassity's testimony is instructive:

> ….
>
> In April, 2020 SOMC leaders asked me to develop a molecular test (PCR) for the detection of SARS-CoV-2, also known as COVID-19. This test was developed, validated, and implemented using nasopharyngeal or anterior nares specimens collection. The method was suitable for use for employees and patients.
>
> **At the time I was brought in to assist on the project, SOMC did not have a PCR method for SARS-Cov-2 in house that could meet the demand for the volumes of patients being tested. SOMC providers were collecting nasopharyngeal specimens and outsourcing such testing to outside third-party laboratories, which resulted in delays of three to seven days before SOMC received the test results. Such delays were not received in a timely enough manner to adequately manage or isolate the patient. Nasopharyngeal swabs was the only specimen source accepted by these laboratories.**
>
> In early-June, 2020, I completed the necessary measures to validate a PCR test for SARS-Cov-2 using nasopharyngeal swabs as the primary specimen type.
>
> ….
>
> During my work on validating an appropriate PCR test for SARS-Cov-2, **the Centers for Disease Control and Prevention ("CDC") recommended the nasopharyngeal collection process. Other**

14

**specimen collection methods, such as saliva testing, had not been studied** or any studies on saliva testing had been published.

Three months after developing the PCR test for SARS-Cov-2 using nasopharyngeal swabs, **I considered saliva testing as an alternative type of testing. However, nasopharyngeal testing was approved as the preferred specimen type for testing by the CDC for Covid-19.**…

An additional significant factor in not using saliva testing was SOMC physicians indicated that they were not supportive of that form of specimen type. I also considered the fact that **the American Society for Microbiology stated that saliva specimen types were less sensitive than the nasopharyngeal specimen collection type.**…

**I ultimately recommended PCR testing for SARS-Cov-2 using nasopharyngeal swabs to SOMC because SOMC already had equipment which allowed it to perform such testing once I was able to validate the test procedure.**

Additionally, patients presenting to SOMC for diagnosis and treatment sign a "consent to treat" form when they are registered. **A separate consent for[m] was not necessary for the collection of a nasopharyngeal swab, since that is part of the standard of care in diagnosing patients with COVID-19 infection.** As a result, SOMC did not need approval from the Institution Review Board ("IRB") for the nasopharyngeal specimen collection.

In evaluating which Covid-19 specimen collection method to adopt, … I was focused on selecting what I considered the best available testing method for patients who presented with symptoms consistent with COVID-19.  That included the most sensitive specimen collection method available for Covid testing which I determined to be the nasopharyngeal swabs.

**As of August, 2021, if SOMC sought to conduct saliva testing in its laboratory, it would have had to "validate" that collection method to be used with existing COVID-19 molecular detection methods.**

Validating a collection method means, in broad terms, to **collect hundreds of saliva and nasopharyngeal specimen[s] and compare them.**

**I estimate that in September, 2021, the validation process for saliva testing would have taken me approximately six months.**

….

> The longest delay in validating the saliva collection method would be obtaining approval from the Institution Review Board which I estimate would have taken approximately two months alone.

(Cassity Decl., Doc. 21-10 (¶¶ 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 18) (bold & underline emphases added)).[17] In a nutshell, then, saliva testing suffered the same timing issues as the early nasopharyngeal testing. Specimens could not be processed in-house, requiring them to be sent to an outside laboratory for analysis. According to Brad Profitt, Administrative Director of the laboratory at SOMC, this would take at least 48 hours, if not longer. (Profitt Decl., Doc. 21-9 (¶¶ 2, 8)). More than doubling the time it takes to learn whether a patient-facing employee is positive for the virus unmistakably compromises SOMC's mission to "serve the community and keep it safe." *See generally MacDonald*, 2024 WL 3316199, at *12. Thus, accommodating Henry a *second* time by allowing her to instead take a saliva test constitutes an undue burden.

In view of the preceding, SOMC is entitled to judgment as a matter of law on Henry's failure-to-accommodate claim.

**Retaliation.** The parties devote little attention to Henry's retaliation claim. For its part, SOMC insists that Henry cannot establish the element of causation. The act of placing her on unpaid leave (after she refused testing) cannot serve as *both* the denial of an accommodation *and* retaliation for her having requested such an accommodation *in the first instance*. Further, and alternatively, Henry presents no evidence that SOMC's concern about the spread of the COVID-19 virus was less than bona fide and, so, pretextual. (Doc. 21-1 PAGEID 186–87).

---

[17] Dr. Cassity's declaration was consistent with his deposition testimony. (*See* Cassity Depo., Doc. 25-2 PAGEID 659–60 (24:10–25)).

16

Henry responds that she "preemptively objected" to SOMC's (anticipated) failure to accommodate in her letters dated September 3 & 14, 2021, in which she advised that "[r]etaliation is against the law." (*See, e.g.*, Doc. 21-3 PAGEID 266). "SOMC took adverse employment action against Ms. Henry within two weeks of her accommodation request, and mere days from her written complaint of discrimination." (Doc. 25 PAGEID 630). "Thus, there is close temporal proximity, and Ms. Henry's prima facie case for retaliation is established." (*Id.* (citing, *inter alia*, *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009))). And, "[w]hether SOMC's stated reasons for termination are pretextual is a question of fact for a jury." (*Id.* PAGEID 631).

Here Henry is grasping at straws. She cites no authority to support "her novel theory of preemptive protected activity," (Doc. 26 PAGEID 693), and the Court is aware of none. Moreover, what she suggests "would convert every failure-to-accommodate claim into a retaliation claim where the employee's request included generic language to the effect that the employer should not engage in unlawful discrimination." (*See id.*). Accordingly, SOMC is entitled judgment as a matter of law on Henry's retaliation claim.

### III. CONCLUSION

Consistent with the foregoing, Defendant's Motion for Summary Judgment (Doc. 21) is hereby **GRANTED**.

**IT IS SO ORDERED.**

/s/ *Michael R. Barrett*
Michael R. Barrett, Judge
United States District Court

17